[Civ. No. 10385. Fourth Dist., Div. One. Apr. 21, 1971.]

WESTERN MOBILEHOME ASSOCIATION et al.,
Plaintiffs and Respondents, v.
COUNTY OF SAN DIEGO et al., Defendants and Appellants.

## Counsel

Bertram McLees, Jr., and Robert G. Berry, County Counsel, Jack Limber and John McEvoy, Deputy County Counsel, for Defendants and Appellants.

Rutan & Tucker, Norman H. Smedegaard, Leonard A. Hampel and John J. Murphy for Plaintiffs and Respondents.

## Opinion

**WHELAN, J.**—Defendant County of San Diego (County) appeals from a judgment in favor of plaintiffs Western Mobilehome Association and its members, John J. Binkinz and Trailrancho Corporation, on their motion for summary judgment (Code Civ. Proc., § 437c).

On December 30, 1969, plaintiffs, as owners of mobilehome parks located in unincorporated areas of San Diego County, filed a complaint seeking declaratory relief and a permanent injunction prohibiting County and its director of public health, Dr. J. B. Askew, from enforcing a County ordinance which establishes annual operating permit fees for mobilehome parks, alleging the ordinance, section 56.107 of the County Code, is unconstitutional and that the field of fee regulation of mobilehome parks is preempted by the Mobilehome Parks Act (Health & Saf. Code, §§ 18200-18700) (hereafter generally referred to as the Act). The complaint alleged County to be the enforcement agency in San Diego County under the Act.

The court denied County's motions for summary judgment and judgment on the pleadings and granted plaintiffs' motion for summary judgment; judgment was entered accordingly.

The judgment declared the ordinance "passed pursuant to Health and Safety Code Section 510 and which added Section 56.107 to the San Diego County Code, is invalid and unconstitutional and attempts to impose additional requirements in an area preempted by Health and Safety Code Sections 18300 and 18502(b)."

Section 510 of the Health and Safety Code (Stats. 1961), pursuant to which the ordinance was enacted, provides in part: "Whenever the governing body of any . . . county . . . determines that the expenses of its health officer in the enforcement of any statute . . . relating to public health, are not met by any fees prescribed by the State, such governing body may adopt an ordinance prescribing such fees as will pay the reason-

able expenses of such officer incurred in such enforcement. The schedule of fees prescribed by ordinance of the governing body shall be applicable in the area in which the health officer enforces any statute . . . relating to public health."

Section 18502 (Stats. 1967, ch. 1056) declared:

"Fees as applicable shall be submitted for permits:

". . . . . . . . . . . . .

"Operating permit fee of twenty-five dollars ($25) for the first 35 lots and fifty cents ($0.50) for each additional lot in excess of the first 35 lots."

On June 30, 1969, Dr. Askew, acting in his official capacity, assumed responsibility for the enforcement of the Act in the unincorporated territory of San Diego County as he was allegedly authorized to do by section 18300 thereof.[1] On July 16, 1969, the County board of supervisors enacted Ordinance No. 3390 (new series), which recited it was adopted pursuant to Health and Safety Code section 510, determined the annual operating fee fixed by Health and Safety Code section 18502 was insufficient to meet the expenses of the health officer, and the fees established by the ordinance were such as would pay the reasonable expenses of enforcement, and fixed a fee of $1.50 for each trailer space with a minimum fee for an operating permit of $25. The ordinance became section 56.107 of the County Code.

Dr. Askew, in his affidavit filed in support of County's motion for summary judgment, stated the fees provided for by the Act were insufficient to meet the expenses of his office in the enforcement of the Act, and that the fees provided for in section 56.107 of the County Code were sufficient for this purpose and were then being collected by him.

### ISSUE ON APPEAL

 The sole question on appeal is whether County is authorized to establish, by ordinance, a schedule of operating permit fees differing from that established by section 18502, subdivision (b), of the Act.

The Act became law in 1961 (Stats. 1961, ch. 2176) as part 2 of division 13 of Health and Safety Code, and replaced former part 2 which

---

[1]That portion of § 18300 here relevant provides: "Upon 30 days written notice from the governing body to the department, any . . . county . . . may assume the responsibility for the enforcement of this part [the Mobilehomes Park Act]."

had been enacted in 1955 (Stats. 1955, ch. 91) and regulated auto and trailer parks.[2]

The 1955 Act required an operating permit to be issued only by the Division of Housing (Division), for which a fee was required to be paid to Division. Section 18009 of the 1955 Act read as follows: "The provisions of this part relating to auto and trailer camps apply to all parts of the State except within cities, counties, and cities and counties that have enacted and are enforcing local ordinances regulating auto and trailer camps and such ordinances prescribe minimum standards equal to or greater than the provisions of this part relating to auto and trailer camps. The provisions of this part shall not prevent local authorities of any city, county, or city and county, within the reasonable exercise of the police power, from prohibiting auto and trailer camps within such city, county, or city and county, or from adopting rules and regulations, by ordinance or resolution, prescribing higher standards of sanitation, health and safety for auto and trailer camps and requiring a local health permit to maintain and conduct any such auto and trailer camp within such city, county, or city and county."

The 1961 Act left no room for the enactment of regulations by local governing bodies, with certain specified exceptions. Section 18010 (Stats. 1961, ch. 2176)[3] provided in part: "The provisions of this part apply to all parts of the State and supersede any ordinance enacted by any city, county, or city and county applicable to the provisions of this part. The Division of Housing may promulgate rules and regulations to interpret and make specific the provisions of this part and when adopted such rules and regulations shall apply to all parts of the State. Upon written notice to the Division of Housing, any city, county, or city and county may assume the responsibility for the enforcement of this part."

Section 18000 of the 1961 Act (Stats. 1961, ch. 2176)[4] declared: "The provisions of this part insofar as they are substantially the same as existing statutory provisions relating to the same subject matter shall be construed as restatements and continuations, and not as new enactments."

Section 18005.7 of the 1961[5] Act provided: " 'Enforcement agency'

---

[2]The Act was amended in 1967 (Stats. 1967, ch. 1056). The amendment in large part was in the renumbering of the sections. Where the "Division of Housing" had been mentioned in the 1961 Act, the amendment spoke of the "Department of Housing and Community Development." The Act as amended in 1967 was in force when the questioned ordinance was adopted.

[3]Section 18300 of the 1967 Act.

[4]Section 18200 of the 1967 Act.

[5]Section 18207 of the 1967 Act.

means the Division of Housing or any city, county, or city and county which has assumed responsibility for the enforcement of this part pursuant to Section 18010."

As to the operating permit, section 18200 of the 1961 Act[6] provided: "It is unlawful for any person to do any of the following unless he has a valid permit issued by the enforcement agency:

" . . . . . . . . . . . . . . .

"(d) Operate a mobilehome park or any portion thereof."

Section 18202 of the 1961 Act[7] provided that the applicable fee for an operating permit should be $20 for the first 35 lots and 50 cents for each lot in excess of 35.

The permit was to be issued by the enforcement agency, with a copy to go to Division (§ 18205). Permits to operate were to be issued annually by the enforcement agency (§ 18206). The enforcement agency was given power to suspend the permit for violations of the Act (§ 18210).[8]

The fundamental question raised on this appeal is the applicability of section 510 of the Health and Safety Code to the initial and annual fees for issuance of an operating permit.

Plaintiffs contend the provisions of the Act are exclusive as to the amount of the fee that may be required by the enforcement agency. They argue that the Act deals with a specific subject while section 510 is of a general nature; because section 510 and the Act both were enacted in 1961 and the Act was in a later numbered chapter than section 510, the later numbered chapter prevails.

The argument fails that section 510 does not apply because the Act deals with a specific subject matter while section 510 is general. It is obvious that "fees prescribed by the state" for the enforcement of a statute will always relate to a specific subject matter; if section 510 is to have application at all, it will always be as to a fee prescribed with relation to a specific subject.

That the 1961 Act is found in a higher numbered chapter than section 510 has little significance unless the two are irreconcilably inconsistent. It is significant otherwise only if section 510 were intended to apply only to fees that already had been prescribed by the state at the time the section

---

[6]Section 18500 of the 1967 Act.

[7]Section 18502 of the 1967 Act.

[8]Sections 18505, 18506 and 18510 of the 1967 Act.

became law. Such a construction is not reasonable. (See *County of Mariposa* v. *Merced Irr. Dist.*, 32 Cal.2d 467, 471-472 [196 P.2d 920].)

If section 510 is to have effect it must apply with regard to any fee prescribed by the state unless the law prescribing the fee itself denies to local governing bodies the right to fix a different fee.

As was said of a different law in *Kaiser Land and Fruit Co.* v. *Curry*, 155 Cal. 638, 647 [103 P. 341]: "Any other construction would render the act absolutely worthless, so far as its practical effect is concerned, and certainly we are not to attribute to the legislature an intention that would bring about such a result, unless that intention is plain."

An example of a statute in which fixing of fees by a local governing body is prohibited is The Radiation Control Law, chapter 7.6 of division 20 of Health and Safety Code (§§ 25800-25876) enacted at the same 1961 session of the Legislature as section 510 and the Act. (Stats. 1961, ch. 1711.)

Section 25810 declares the department [of Public Health] is the agency responsible for the issuance of licenses. It may enter into agreement with local agencies to conduct technical evaluation of license applications.

Section 25816 declares the department shall provide by regulation a schedule of fees to be paid by applicants for licenses to be applied for the purpose of the issuance of licenses and inspection and regulation. "Any agreement made pursuant to Section 25810 shall include provisions for distribution of funds provided for this program proportionate to the services performed by each participating agency." (Health & Saf. Code, § 25816.)

Section 25817 provides for a schedule of fees for registration of persons possessing sources of ionizing radiation, fixes a maximum annual fee, and, as in section 25816, provides for a distribution of a proportion of fees among contract agencies.

Section 25840 declares that no city or county shall require payment of a fee for the activities described in either section 25816 or 25817 if the department has provided by regulation for payment of a fee.

Health and Safety Code section 3382, enacted at the same 1961 session, imposes upon counties the duty of carrying out a program of poliomyelitis immunization. The county health officer is to estimate the cost of the program in his county and fix fees accordingly. The section expressly provides that any cost to the county in excess of fees collected should "be paid by the county in the same manner as other expenses of the county are paid."

■ The last paragraph of Government Code section 9605 reads: "In the absence of any express provision to the contrary in the statute which is enacted last, it shall be conclusively presumed that the statute which is enacted last is intended to prevail over statutes which are enacted earlier at the same session and, in the absence of any express provision to the contrary in the statute which has a higher chapter number, it shall be presumed that a statute which has a higher chapter number was intended by the Legislature to prevail over a statute which is enacted at the same session but has a lower chapter number."

The application of that presumption in a particular case must depend upon a real, or at least apparent, conflict or inconsistency between the two statutes. When two laws upon the same subject, passed at different times, are inconsistent with each other, the one last passed must prevail. (*Davis* v. *Whidden,* 117 Cal. 618, 622 [49 P. 766].)

To overcome the presumption against repeal by implication the two acts must be irreconcilable, clearly repugnant, and so inconsistent as to prevent their concurrent operation; and the courts are bound to maintain the integrity of both statutes if they may stand together. (*Warne* v. *Harkness,* 60 Cal.2d 579, 588 [35 Cal.Rptr. 601, 387 P.2d 377]; *Bateman* v. *Colgan,* 111 Cal. 580, 586 [44 P. 238].)

As between section 510 and the 1961 Act, it is arguable which is the specific Act and which is the general one. Section 510 is specific as to the right of local governing bodies to fix fees different from those prescribed by the state; the Act so far as regards fees is general, the fees being merely a detail in the overall general subject matter of mobilehomes and mobilehome parks. (See *Dobbins* v. *Board of Supervisors of Yuba County,* 5 Cal. 414;[9] *People* v. *McGuire,* 32 Cal. 140.)[10]

---

[9]"On the 1st of May, 1851, two Acts were passed by the Legislature: one, an Act to regulate Proceedings in Criminal Cases; the other, an Act to regulate Fees in Office. Both Acts fix the fees of the Clerk of the Court in criminal cases, and the two are essentially different in their provisions.

"In this dilemma, the latter Act must govern from the time it went into effect, May 1, 1852. The subject of fees was the sole object of that Act, and consequently the inference deducible is, that the attention of the Legislature was more particularly directed to establishing the correct rates of fees than it was in the first-mentioned Act —the main object of which was to regulate criminal proceedings, and to which the fixing of Clerk's fees was a slight incident, easy to be overlooked, and disregarded; especially when we reflect upon the length, importance, and subject matter of the Act." (*Dobbins* v. *Board of Supervisors of Yuba County,* 5 Cal. 414, 415.)

[10]"Although both Acts were approved on the same day, yet it is clear that the Act creating the Sixteenth Judicial District contains the latest will of the Legislature; besides, the assignment of Kern County to a particular Judicial District was not the main purpose of the Act creating the county, but an incident which ordinarily would be provided for in the Act dividing the State into Judicial Districts, and under the present circumstances, in the Act creating the Sixteenth Judicial District. The former

In either event the two statutes should be reconciled if reasonably it may be done.

Every statute should be construed with reference to the whole system of law of which it is a part. ■ Where two statutes are *in pari materia* they should be not only construed together, but they should be reconciled so as to uphold both of them if reasonably possible. This rule applies even though one statute deals generally with the subject and the other legislates upon the same subject with greater particularity. (*Modesto Irr. Dist.* v. *City of Modesto,* 210 Cal.App.2d 652, 656 [27 Cal.Rptr. 90].)

The subsequent history of the Act may be considered for any aid it may give in ascertaining the legislative intent as embodied in section 510 and the 1961 Act. The Legislature in later years has not in terms given its interpretation of the 1961 Act as related to section 510. Had it done so, such interpretation would be entitled to consideration but would not be binding upon the court. (*California Emp. etc. Com.* v. *Payne,* 31 Cal.2d 210, 213-214 [187 P.2d 702]; *Bd. of Soc. Welfare* v. *County of L. A.,* 27 Cal.2d 90, 97 [162 P.2d 635]; *Stockton Sav. & Loan Bank* v. *Massanet,* 18 Cal.2d 200, 204 [114 P.2d 592]; *Bates* v. *McHenry,* 123 Cal. App. 81, 93 [10 P.2d 1038]; *Rutledge* v. *Dominquez,* 122 Cal.App. 680, 685 [10 P.2d 1027].)

In 1969 section 18502 of the 1967 Act was amended (Stats. 1969, ch. 1553) to read with regard to operating permits: "Fees as applicable shall be submitted for permits:

"· · · · · · · · · · · · · ·

"(b) Operating permit fee of twenty-five dollars ($25) for the first 35 lots and fifty cents ($0.50) for each additional lot in excess of the first 35 lots; provided, however, that the commission may establish a separate schedule of fees for operating permits to defray the cost of enforcement where the department is the enforcement agency. Such fees established by the commission shall not exceed an initial fee of twenty-five dollars ($25) per park and an additional two dollars ($2) per lot."

Section 2 of chapter 1553 reads: "The changes made to Section 18502 of the Health and Safety Code by Section 1 of this act shall remain in effect until the 91st day after the final adjournment of the 1971 Regular Session of the Legislature, and shall have no force or effect after that date. On and

---

Act is specially and mainly devoted to the creation of the county, and the latter with the creation of the district. Where such is the case each Act must furnish the rule applicable to its main purpose, because it must be presumed that the attention of the Legislature was therein more especially called to that branch of the general subject." (*People* v. *McGuire,* 32 Cal. 140, 143-144.)

after that date, Section 18502 of the Health and Safety Code shall read exactly as it read immediately prior to the effective date of this act."

The commission acted under the authority thus conferred and in 1969 amended California Administrative Code, title 25, section 5040, relating to operating permit fees for mobilehome parks, special occupancy trailer parks and campgrounds by adding subsection (b) to provide that: "(b) Where the department is the enforcement agency, the annual permit to operate shall be an initial fee of twenty-five dollars ($25) per park and an additional two dollars ($2) per lot."

The application of the maxim "expressio unius est exclusio alterius" with regard to the 1969 amendment to section 18502 means no more than that the commission was not to establish the fee when a local agency was the enforcement agency. It does not meet the question whether under section 510 the local enforcement agency had that power; and if the local enforcement agency had the power the failure to authorize the commission to fix the fee of the local agency is explained.

Although the 1969 amendment that empowered the commission to fix fees for operating permits where the department was the enforcement agency was by its terms to be in effect for only three years, it had even a shorter life.

In chapter 1512 of the 1970 statutes, section 18502 was amended to read: "Fees as applicable shall be submitted for permits:

" . . . . . . . . . . . . .

"(b) Annual operating permit fee of twenty-five dollars ($25) and an additional one dollar ($1) per lot."

From 1961 to and including 1969, the Act required the enforcement agency to inspect at least once annually (§ 18101 of 1961 Act; § 18401 of 1967 Act).

In 1970 (ch. 1512, p. 3031), section 18401 was amended to read: "The enforcement agency shall inspect each mobilehome park at least once biennially to determine compliance with this part."

There have been no other significant changes in the Act.

The Legislature took action to reestablish the fees at a higher rate; at the same time it required a biennial inspection instead of an annual inspection.

The latter amendment may be interpreted in connection with the possible applicability of section 510 as having been intended to lower the costs of

required inspection so that the local government would have no necessity to fix a fee higher than that fixed by the state in the 1970 amendment.

■ We do not interpret section 510 to mean, as argued by plaintiffs, that it is to apply only when enforcement of state law is "prescribed by a state officer or department."

Health and Safety Code section 452 imposes on the county health officer the observance and enforcement of: "(b) Orders, quarantine and other regulations, and rules prescribed by the State Department of Public Health.

"(c) Statutes relating to public health."

Health and Safety Code section 504 imposes like duties upon the city health officer.

Those statutes in their present form have been in effect since 1949.

Section 510 must apply to the duties of the health officer as defined in sections 452 and 504. When the county assumed the enforcement of the Act, the duty of enforcement was placed upon the health officer by the quoted section.

■ We do not find an irreconcilable conflict between section 510 and the fee-fixing provisions of the Act. There is such a conflict between section 510 and The Radiation Control Law.

Although the state has assumed original jurisdiction in the matter of regulating mobilehomes and mobilehome parks, it has provided for local regulation as to certain matters within that field. It has permitted local governments at their option to undertake the full duties of enforcement, to collect operating permit fees, to issue such permits and to control them under the power to suspend them. All those considerations are consistent with an interpretation of the Act and of section 510 that views the latter section as authorizing the local enforcement agency to determine its own costs of enforcement and to fix fees commensurate therewith.

We hold, therefore, that section 510 empowered Board to enact the ordinance in question.

The judgment is reversed with directions to the trial court to enter judgment in favor of County.

Brown (Gerald), P. J., and Coughlin, J., concurred.

A petition for a rehearing was denied May 4, 1971, and respondents' petition for a hearing by the Supreme Court was denied June 17, 1971.